13 CV 9222

## IN THE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL JAVORSKY and BRICK PIZZERIA LLC, behalf of themselves, and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>THE GOLDMAN SACHS GROUP, INC., GS POWER HOLDINGS LLC, METRO INTERNATIONAL TRADE SERVICES LLC, JPMORGAN CHASE & COMPANY, HENRY BATH LLC, GLENCORE XSTRATA PLC, PACORINI METALS AG, PACORINI METALS USA LLC, NEMS (USA) INC., LONDON METAL EXCHANGE LIMITED, LME HOLDINGS LIMITED, and JOHN DOES 1-25,<br>    Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>**Civil Action Case No.** |

RECEIVED
DEC 31 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Daniel Javorsky and Brick Pizzeria LLC (collectively "Plaintiffs") bring, on behalf of themselves and all others similarly situated, upon knowledge as to themselves and their own acts, upon information and belief as to all other matters, and based on the investigation of counsel, this class action for damages, injunctive relief, and other relief pursuant to federal and state antitrust laws, state unfair competition laws, and state consumer protection laws, demand a trial by jury, and alleges as follows:

## NATURE OF THE ACTION

1.     This is a class action lawsuit against The Goldman Sachs Group, Inc., GS Power Holdings LLC, Metro International Trade Services LLC, JPMorgan Chase & Company, Henry

Bath LLC, Glencore Xstrata plc, Pacorini Metals AG, Pacorini Metals USA LLC, NEMS (USA)

Inc., London Metal Exchange Limited, LME Holdings Limited, and unnamed co-conspirators

(collectively, "Defendants"), who have, from at least February 1, 2010 to the present (the "Class

Period"), engaged in acts and practices, in combination, conspiracy, or agreement with one

another, or individually, to restrain trade in, and to restrict the deliverable supply of, aluminum

stored in London Metal Exchange-approved warehouses.  Defendants engaged in the acts and

practices alleged herein with the purpose and effect of increasing the price of aluminum and

Aluminum Products and profiting thereby, as well as from increased storage fees for increased

amounts of stored aluminum.  The acts and practices alleged herein violate federal and state

antitrust laws and state unfair competition laws.

       2.       As a direct and proximate cause of the acts and practices alleged in this

complaint, Defendants have injured Plaintiffs and the Class in the form of supra-competitive

prices for aluminum and products containing aluminum ("Aluminum Products").

       3.       As more fully set forth herein, Defendants' scheme involved (1) Defendants

acquiring a substantial portion of warehouses approved by the LME for the storage of exchange-

traded aluminum, and (2) Defendants utilizing a series of strategies to restrict aluminum

delivered from those warehouses and increase the rents paid to the warehouses by metal owners.

These practices substantially increased the prices paid by direct purchasers of aluminum and/or

manufacturers of Aluminum Products and, accordingly, the prices paid by end-users of those

products, i.e. Plaintiffs and the Classes.

       4.       As described more fully herein, Defendants' strategies included: (1) providing

aluminum producers and owners with significant financial incentives to store aluminum in LME-

approved warehouses instead of releasing that aluminum to the open market; (2) agreeing to treat

certain LME rules requiring warehouses to deliver a minimum specified quantity of aluminum daily as a rule setting a maximum, rather than a minimum, quantity to be released; and (3) shuttling the minimum quantities of aluminum they did release between their own warehouses instead of releasing it to the market. Defendants' practices had the effect of limiting the supply of, and increasing the price of, aluminum, and of increasing Defendants' storage revenues.

5.   Many factors plausibly suggest the existence of a conspiracy. These include:

a.   First, no single defendant could successfully restrict supplies and delivery periods acting alone;

b.   Second, all Defendants had financial incentives to inflate their storage revenues through restricting the amount of aluminum that could leave LME warehouses;

c.   Third, Defendants' actions have given rise to a historically unprecedented increase in the price of aluminum and in the Midwest Aluminum Premium (defined herein) that cannot be explained by factors other than conspiracy;

d.   Fourth, Defendants' actions have caused a historically unprecedented increase in the amount of aluminum stored in LME-approved warehouses;

e.   Fifth, Defendants engaged in highly unusual and historically unprecedented parallel conduct involving increases to the per-metric-ton storage cost and utilization of LME's minimum load-out rate as a maximum;

f.   Sixth, multiple government agencies, including the European Union, the Commodities Futures Trading Commission, and the Department of Justice, have announced they are investigating or considering investigating Defendants' warehousing practices;

g.   Seventh, Defendants had opportunities to conspire, most notably through
     having representatives sit as LME Warehousing Committee members.  North
     European Marine Services, LTD, Henry Bath & Son, Ltd., Pacorini, and
     Metro International all have committee members on the LME Warehousing
     Committee and the LME has a secretary listed for the same committee.

h.   Eighth, after news reports surfaced regarding the manipulation of aluminum,
     Goldman Sachs and JPMorgan announced their intentions to sell or spin off
     their warehouses and exit the commodities business entirely.

## JURISDICTION AND VENUE

6.     This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26 and 18 U.S.C. § 2201 for violations of Section 1 of the Sherman Act for declaratory and injunctive relief, as well as under various state laws.

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 1 of the Sherman Act, 15 U.S.C. § 1, and 28 U.S.C. §§ 1331 and 1337.

8.     The Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the United States district courts for any multi-state class action where the aggregate amount in controversy exceeds five million dollars and where the citizenship of any member of the class is different from that of any defendant.

9.     This court has subject matter jurisdiction of the pendant state law claims under 28 U.S.C. § 1367.

4

10.     This court has personal jurisdiction over each Defendant by virtue of its or its subsidiaries' business activities in this District.

11.     Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

12.     The activities of Defendants and their unnamed co-conspirators, as discussed herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on interstate trade and commerce of the United States, and on intrastate trade and commerce of the several states whose laws were violated as alleged herein.

## PARTIES

13.     Plaintiff Daniel Javorsky is a California resident who indirectly purchased Aluminum Products, for end use and not for resale, at prices intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Plaintiff's indirect purchases of aluminum include beverages in aluminum cans and aluminum foil.

14.     Plaintiff Brick Pizzeria LLC is a California corporation that indirectly purchased Aluminum Products, for end use and not for resale, at prices intentionally and directly inflated by Defendants' conduct throughout the Class Period.  Plaintiff's indirect purchases of aluminum include pots and sauté pans, construction materials (including ductwork), sheet pans, and hotel pans.

15.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a multinational investment banking firm incorporated in Delaware with headquarters at 200 West Street, New York, New York 10282.   Goldman Sachs provides investment banking, securities, and

investment management and financial services to corporations, financial institutions, governments, and high net-worth individuals.

16.     Defendant GS Power Holdings LLC ("GS Power") is a wholly owned subsidiary of Goldman Sachs incorporated in Delaware and with headquarters at 85 Broad Street, New York, New York 10004.

17.     Defendant Metro International Trade Services LLC ("Metro International") is a wholly owned subsidiary of Mitsi Holdings LLC, which is, in turn, a wholly owned subsidiary of GS Power Holdings LLC.  Metro International is incorporated in Delaware and has headquarters at 6850 Middlebelt Road, Romulus, Michigan 48174.  Metro International is, according to its website, "a leading global warehouse operator, specializing in the storage of non-ferrous metals for the London Metal Exchange."

18.     Defendant JPMorgan Chase & Company ("JPMorgan") is a multinational banking and financial services holding company incorporated in Delaware and with headquarters at 270 Park Avenue, New York, New York 10017.  JPMorgan provides various financial services and is the largest bank in the United States by assets.

19.     Defendant Henry Bath LLC ("Henry Bath") is a Delaware limited liability company with headquarters at 2500-A Broening Highway, Baltimore, Maryland 21224.  Henry Bath is a subsidiary of Henry Bath & Son Limited, which operates as an indirect subsidiary of J.P. Morgan Ventures Energy Corporation, which is, in turn, a wholly owned subsidiary of JPMorgan.  Henry Bath owns and operates warehouses that store and ship exchange-traded metals and agricultural commodities, including aluminum.

20.     Defendant Glencore Xstrata plc (collectively with its predecessor Glencore International plc, "Glencore") is a United Kingdom public liability company with headquarters at

Baarermattstrasse 3, CH-6340 Baar, Switzerland.  Glencore is, according to its website, "one of the world's largest global diversified natural resources companies."  Glencore engages in the production, storage, transportation, and marketing of various commodities, including aluminum, and derivatives that derive their value from underlying asset prices of commodities.  In August 2010, Glencore acquired the metals warehousing business of Pacorini Group and has owned it and all of its subsidiaries since.

21.      Defendant Pacorini Metals AG ("Pacorini") is, according to its website, "a leading provider of LME warehousing and logistics services to producers, consumers, financiers and traders of base metals."  Pacorini Metals AG is headquartered at Baarerstrasse 53/55, CH-6300 Zug, Switzerland.

22.      Pacorini Metals USA LLC ("Pacorini USA") is a Louisiana limited liability company with headquarters at 5736 Citrus Boulevard, Suite 104, New Orleans, Louisiana 70123.  Pacorini USA operates as a wholly owned subsidiary of Pacorini and owns and operates London Metal Exchange-approved warehouses in the United States that store aluminum, among other metals.

23.      Defendant NEMS (USA) Inc. ("NEMS") is a wholly owned subsidiary of North European Marine Services, Limited, which is, in turn, a wholly owned subsidiary of Trafigura Beheer BV, a Dutch multinational commodity trading company with headquarters at 20th Floor, ITO Tower, Gustav Mahlerplein 102, 1082 MA Amsterdam, The Netherlands.  Trafigura owns London Metal Exchange-approved warehouses in the United States through its NEMS (USA) Inc. subsidiary.

24.      Defendant The London Metal Exchange Limited ("LME") is a United Kingdom futures exchange corporation that, according to its website, is responsible for more than 80

percent of the global non-ferrous metals trading market.  In December 2012, Hong Kong

Exchanges and Clearing Limited ("HKEx Group") acquired LME Holdings Limited, the LME's

parent company.  The LME is headquartered at 56 Leadenhall Street, London EC3A 2DX,

United Kingdom.

25.     Defendants John Does Nos. 1-25 are other entities or persons, who own

warehouses, have similar financial interests as the Defendants, or have otherwise participated as

co-conspirators with Defendants in the agreement.  The John Doe Defendants participated in,

furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged

herein, including the restraint of trade, fixing, and manipulation of the price of physical

aluminum and the Midwest Transaction Premium to artificial levels.

### CO-CONSPIRATORS

26.     Various other persons, firms, and corporations, unknown to Plaintiffs at this time,

have participated as co-conspirators with Defendants and have performed acts and made

statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

Defendants are jointly and severally liable for the acts of their co-conspirators whether named or

unnamed as Defendants.

27.     Whenever reference is made to any act, deed, or transaction of any corporation,

company, or other entity, the allegation means that the entity engaged in the act, deed, or

transaction by or through its officers, directors, agents, employees, or representatives while they

were actively engaged in the management, direction, control, or transaction of the entity's

business or affairs.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff classes (collectively "Classes"):

a. For violations of the federal antitrust laws.

All persons and entities in the United States that, during the Class Period, purchased aluminum and/or Aluminum Products indirectly for end use and not for resale (hereinafter "Nationwide Class").

b. For violations of the California state antitrust and unfair competition laws.

All persons and entities in California that, during the Class Period, purchased aluminum and/or Aluminum Products indirectly for end use and not for resale (hereinafter "California Class").

c. For violations of multi-state antitrust laws.

All persons and entities in Arizona, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin that, during the Class Period, purchased aluminum and/or Aluminum Products indirectly for end use and not for resale (hereinafter "Multi-State Antitrust Class").

d. For violations of multi-state unfair competition laws.

All persons and entities in Alaska, Arkansas, the District of Columbia, Florida, Georgia, Idaho, Kansas, Louisiana, Maine, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, Utah, Vermont, and West Virginia that, during the Class Period, purchased aluminum and/or Aluminum Products indirectly for end use and not for resale (hereinafter "Multi-State Consumer Protection Class").

29.     Members of the Classes are so numerous that joinder would be impracticable. Though the exact number and their identities unknown, Plaintiffs believe that there are tens of thousands of Class members geographically dispersed throughout the United States.

30.     Plaintiffs' claims are typical of those of members of the Classes.  Plaintiffs and Class members paid more for aluminum and Aluminum Products because of Defendants' wrongful conduct.

31.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes in that Plaintiffs' interests are aligned with those of the Class members.  Plaintiffs have no interests that are adverse to, in conflict with, or are antagonistic to the interests of the Class. Plaintiffs have retained counsel competent and experienced in the prosecution of class action and antitrust litigation to represent themselves and the Classes.

32.     Class action treatment is a superior method for the fair and efficient adjudication of this controversy because individual joinder of all damaged Class members is impractical. Allowing this case to proceed as a class action will permit a large number of similar situated, geographically dispersed persons and entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.  Absent a class action, it would not be feasible for Class members to seek redress or relief for the violations of law alleged herein. Further, individual litigation presents the potential for inconsistent or contradictory judgments that would magnify the delay and expense to all parties and to the courts.  A class action presents fewer case management difficulties.

33.     There are questions of law and fact common to the Classes that predominate over any questions affecting only individual members of the Classes, including, but not limited to:

        a.   Whether Defendants and their unnamed co-conspirators engaged in a conspiracy among themselves to fix, raise, maintain, or stabilize prices of aluminum sold throughout the United States;

10

b.   The identity of the participants in the alleged conspiracy;

c.   The duration of the alleged conspiracy and the nature of the acts, deeds, or transactions performed by Defendants and their unnamed co-conspirators in furtherance of the conspiracy;

d.   Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.   Whether the alleged conduct of Defendants violated the various state laws alleged in this complaint;

f.   Whether the alleged conduct of Defendants and their unnamed co-conspirators caused injury to the property or business of Plaintiffs and the Class members;

g.   The effect of Defendants' alleged conspiracy on the price of aluminum purchased during the Class Period;

h.   The appropriate measure of damages sustained by Plaintiff and the Classes; and,

i.   The appropriate nature of injunctive or other equitable relief.

## FACTUAL ALLEGATIONS

I.   **ALUMINUM AND THE LME**

   a.   **Background**

34.   Aluminum is the most abundant metal in Earth's crust, but is not found freely in nature.  Primary producers of aluminum, such as Alcoa Inc. and Century Aluminum Co., mine bauxite, extract alumina from the bauxite, and refine alumina into aluminum, which is then processed into formed shapes for various consumer products.

35.     Today, aluminum is used in a wide variety of products such as aluminum cans, foils, utensils, baking sheets, pots and pans, automobiles, airplanes, rockets, appliances, ladders, grills, computers, cell phones, baseball bats, fishing gear, and much more.

36.     In 1978, the LME began facilitating the purchase and sale of metals through futures, options, and other financial instruments.  It does not itself engage in physical trading.

37.     The LME has a multi-tiered membership structure, and only member firms may trade contracts on the LME.  The LME'S members owned, governed, and controlled it until the HKEx Group acquired it in December 2012.

38.     J.P. Morgan Securities plc, an indirect subsidiary of Defendant JPMorgan, is a "Category 1 – Ring Dealing" member; Goldman Sachs International, an indirect subsidiary of Defendant Goldman Sachs, is a "Category 2 – Associate Broker Clearing" member; and Glencore (UK) Limited, an indirect subsidiary of Defendant Glencore, is a "Category 5 – Associate Trade" member.

39.     The LME is a self-regulating organization.  Both the U.K. Financial Conduct Authority and the U.S. Commodities Futures Trading Commission have expressed uncertainty regarding their ability to regulate the LME.

**b.   Role of Warehousing in the Sale of Aluminum**

40.     The LME approves warehouses for the storage of exchange-traded metals, including aluminum.  These warehouses play a critical role in aluminum trading.

41.     The LME promotes this system as a market of "last resort," meaning that industry can use it to sell excess stock in times of oversupply and as a source of material in times of extreme shortage.

12

42.     Owners of warehoused aluminum possess warrants evidencing their ownership. A warrant is a document of title, issued by a warehousing company, for a specific lot of metal held within an LME-approved warehousing facility.  Warehousing companies issue warrants when checking aluminum into warehouse for storage, and cancel them when they receive an order for load-out.  Each warrant is for a specific tonnage and brand and is not interchangeable. LMEsword is the electronic transfer system for LME warrants.  Warrants trade on the LME, and aluminum producers may house aluminum in LME warehouses and then sell warrants to buyers on the LME.

43.     At the expiration of an LME aluminum forward or futures contract, delivery of warrants for aluminum in an LME-approved warehouse must be made by sellers (or "shorts") who have not liquidated (i.e., traded out of their contract) to buyers (or "longs") who have not liquidated.

44.     Once a warrant for a metals purchase issues, the owner generally pays the LME-approved rent for storing the lot in an LME-approved warehouse.

45.     To take possession of warehoused aluminum, the warrantholder must make a request to move the metal and the warehouse then schedules delivery of the metal itself.  The warrantholder remains liable for the cost of storage until the warehouse delivers the aluminum to the warrantholder seeking delivery.  Accordingly, if the warehouse does not timely ship the aluminum to the warrantholder, the warrantholder must continue paying rent to the warehouse until such delivery occurs.

46.     In July 2013, the maximum daily per-metric-ton storage cost for aluminum charged by Defendants' warehouses was 48 cents.  The current rate is the result of multiple

increases to the per-metric-ton storage cost implemented by Defendants: from 40 cents in 2010, to 41 cents in 2011, to 45 cents in 2012, and 48 cents in 2013.

47.     The LME earns 1.1 percent of the total storage fees charged by its approved warehouses.  It is thus in the LME's financial interest to keep as much aluminum in storage as possible.

### c. <u>The LME Warehouse Rules</u>

48.     The LME Warehousing Committee bears responsibility for making recommendations on warehousing policy issues to the LME's Executive Committee.  The LME's Executive Committee, in turn, possesses the authority to approve matters relating to the Rules & Regulations of the LME.  Defendants Goldman Sachs, JPMorgan, and Glencore, through their subsidiaries, each have representatives on the LME Warehousing Committee.

49.     One such rule governs minimum "load-outs," and requires LME-approved warehouses to deliver or load-out a minimum tonnage of aluminum each day.

50.     Prior to April 2012, the minimum load-out rule required warehouse owners to load out 1,500 tons of aluminum per city, per day.  It did not require netting load-outs against load-ins, and applied to all warehouses in a particular city collectively, rather than to each individual warehouse.

51.     In April 2012, the minimum load-out rule changed to require 3,000 tons of load-out.  However, it still did not require netting load-outs against load-ins, and still applied to all warehouses in a particular city collectively, rather than to each individual warehouse.

52.     Because the minimum load-out rule did not require netting load-outs against load-ins, it permitted accumulation of aluminum in LME-approved warehouses.

14

53.     Moreover, because the rule permitted aggregation of load-outs from all warehouses in a particular city, it significantly limited its efficacy in cities with multiple aluminum warehouses.  For example, it meant that each of Goldman's Metro International's Detroit warehouses needed to release a minimum of only 41 tons of aluminum per day.

## II.     DEFENDANTS RESTRICT THE SUPPLY OF AND INCREASE THE PRICE OF ALUMINUM

### a.    Defendants Acquire LME-Approved Warehouses

54.     At the beginning of the Class Period, Defendants began acquiring LME-approved warehousing facilities.

55.     Goldman Sachs purchased Metro International in February 2010.  In March 2010, Trafigura purchased North European Marine Services, Limited and its subsidiaries.  In July 2010, JPMorgan acquired Henry Bath. Finally, in September 2010, Glencore acquired Pacorini.

56.     Of the 157 LME-approved warehouses in the United States, Goldman Sachs owns 70 (44.59 percent), Glencore owns 50 (31.84 percent), JPMorgan owns 11 (7.01 percent), and Trafigura owns 3 (1.91 percent) – collectively, 85.35 percent.

57.     Defendants currently own or operate a majority of LME-approved warehouses in seven of the nine regions in which LME-approved warehouses exist in the United States. Defendants own or operate fifty five of fifty six warehouses in New Orleans, Louisiana (98.2 percent); thirty two of thirty eight warehouses in Detroit, Michigan (84.2 percent); all seventeen warehouses in Mobile, Alabama (100 percent); seven of sixteen warehouses in Baltimore, Maryland (43.75 percent); fifteen of sixteen warehouses in Chicago, Illinois (93.75 percent); four of six warehouses in Toledo, Ohio (66.67 percent); all three warehouses in Long Beach and Los Angeles, California (100 percent); and one of three warehouses in St. Louis, Missouri.  Only in Owensboro, Kentucky, do Defendants not own or operate warehouses.

15

58.    Thus, these acquisitions placed ownership, warehousing, and control of LME policy and trading in the hands of Defendants.  As one expert put it, "[o]wnership of the key LME warehouses by large commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices."[1]

59.    These acquisitions also created substantial incentives for Defendants to increase the volume of aluminum stored in LME-approved warehouses and the length of time it is stored there, as they derive rental income from such storage.

### b.  Defendants Stockpile Aluminum in Their Warehouses

60.    Following acquisition of LME-authorized warehouses, Defendants began a scheme aimed at stockpiling aluminum in their warehouses.

61.    ***First***, Defendants agreed to treat the minimum load-out rule as a de facto maximum load-out rule, releasing no more aluminum from their warehouses than required by the rule regardless of demand and regardless of load-in rates.  As one observer described it:

> LME warehouse rules…essentially create a funnel, with a wide end at entry and a very narrow end exiting out. At the wide end, there is a massive supply of metal going into these warehouses, at the rate of tens of thousands of metric tons per day. At the narrow end, the LME warehouses, such as those in Detroit, use minimum load-out rates as maximums . . . .  Just imagine a big garage door market "in" and the small front door of your house marked "out." A lot more metal goes into the warehouse than comes out.

Tim Weiner, Global Risk Manager of Commodities and Metals for MillerCoors,

Testimony before U.S. Senate.

---

[1] Testimony of Professor Saule Omarova before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection on July 23, 2013

62.     Defendants could easily have loaded out far more than the minimum.  A *Reuter's* article calculated that a single warehouse in Detroit with two doors, two forklifts, and an eight-hour working day could move out as much as 1,920 tons of metal every day.  As shown above, the 1,500-ton minimum load-out rules applicable to each city meant each of Goldman's Metro International's Detroit warehouses needed to release a only 41 tons of aluminum per day to satisfy the rule – a small fraction of their capabilities.

63.     Defendants' agreement to treat the minimum load-out rules as maximums constitutes a horizontal contract, combination and/or conspiracy and a *per se* restraint of trade under the Sherman Act and its state-court analogs.

64.     **Second**, because the load-out rules failed to require load-outs to be netted against load-ins, Defendants were able to further restrict supply and increased storage times by transferring aluminum between their own warehouses rather that delivering it to customers. As the *New York Times* observed, "nearly all of the metal that Metro [warehouse] moves is not delivered to customers . . . . Instead, it is shuttled from one warehouse to another."[2]  In practice, this meant that:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses. Two or three times a day, sometimes more, the drivers make the same circuits. They load in one warehouse. They unload in another. And then they do it again.[3]

65.     This process – which one former warehouse forklift driver described as a "merry-go-round of metal" – prevented the shuffled aluminum from reaching the market to satisfy pent-up demand, instead keeping the aluminum in Defendants' warehouses.[4]

---

[2] Kocieniewski, David.  "A Shuffle of Aluminum, but to Banks, Pure Gold."  New York Times. July 20, 2013.
[3] *Id.*
[4] *Id.*

66.     Defendants' agreement to terms permitting such shuttling is a horizontal contract, combination and/or conspiracy and a *per se* restraint of trade under the Sherman Act and its state-court analogs.

67.     **Third**, Defendants used their supracompetitive profits to pay substantial financial incentives to aluminum producers and owners to store aluminum in Defendants' warehouses instead of releasing it to the market – as much as $230 a ton or more.  These incentives provided metal owners with immediate cash, and made it more profitable to maintain aluminum in Defendants' warehouses.  Moreover, because these incentives lowered metal owners carrying costs, financial institutions and other owners could make a profit by purchasing aluminum, storing it in Defendants' warehouses and paying the storage costs, and contracting to sell the aluminum in the future.  This further reduced the supply of aluminum available to the market, and increased the amount of aluminum in Defendants' warehouses.

68.     **Thus**, as described more fully below, as a direct result that is inextricably intertwined with the foregoing conduct, Defendants agreed to inflate the price of aluminum to all-time record highs.

### c.  <u>Defendants' Scheme Increases Aluminum Stockpiled in their Warehouses</u>

69.     For most of the LME's operating history, its warehouses represented a small percentage of global aluminum supplies.  However, because of Defendants' scheme, the amount of aluminum held in LME-approved warehouses has soared, exploding from 1.2 million tons in July 2008 to 6 million tons in April 2013.

70.     Aluminum in U.S. warehouses increased similarly.  In Detroit alone, the amount of aluminum stored in LME-certified warehouses rose from 900,000 tons to 1.49 million tons between 2010 and 2012.

71.     During the Class Period, stockpiles of warehoused aluminum should have declined as the United States economy was in a period of recovery following a crushing recession.  At such times, the supply of warehoused aluminum should shrink as surplus aluminum warehoused during the recession made its way back into the recovering marketplace.

### d.  Defendants' Scheme Increases Delivery Time And Storage Costs for Aluminum

72.     Prior to Goldman Sachs' purchase of Metro International, the average wait for aluminum contracts to be fulfilled was six weeks.  After the purchase, the wait has increased to over sixteen months, according to *The New York Times*.[5]

73.     The historically unprecedented amount of aluminum stored in LME-approved warehouses, coupled with historically long wait times for the fulfillment of aluminum deliveries, would not occur under normal circumstances.  Large inventories indicate that there is ample supply of aluminum available for immediate delivery.

74.     From July 2009 to July 2011, Coca-Cola Co. and Novelis Inc., among other major aluminum users, complained over the increasing delays in wait times of aluminum delivery, prompting the LME in April 2012 to double the minimum load-out rate from 1,500 tons to 3,000 tons.  While the LME purportedly intended the new delivery rate to lower the cost of buying physical aluminum supplies and to ease the supply bottleneck, nearly one and a half years later there still is a multi-month backlog of warehouse orders and correspondingly high prices.

75.     In June 2013, the Beer Institute, a trade group that represents beer makers, joined a growing chorus of companies complaining about long waits for metals in LME-approved warehouses.  The Beer Institute urged the LME to take necessary steps to alleviate the warehouse backlog and to end "practices that are interfering with normal supply and demand dynamics" that

---

[5] Kocieniewski, David.  "A Shuffle of Aluminum, but to Banks, Pure Gold."  New York Times. July 20, 2013.

have "led to a complete disconnect between LME aluminum prices and actual aluminum prices and prevent[ed] brewers and their suppliers from obtaining aluminum in a reasonable timeframe at fair-market prices."[6]

76.     In July 2013, at the U.S. Senate Committee on Banking, Housing, and Urban Affairs hearing described in more detail below, Timothy Weiner, Global Risk Manager of Commodities/Metals at MillerCoors LLC, expressed the concern of his company over U.S. bank holding companies effectively controlling all key elements of the LME.  Mr. Weiner further testified that "[a]luminum users like MillerCoors are being forced to wait in some cases over 18 months to take physical delivery due to the LME warehouse practices or pay the high physical premium to get aluminum today . . . . It is only with aluminum purchased through the LME that our property is held for an extraordinary period of time, with the penalty of paying additional rent and premiums to the warehouse owners, until we get access to the metal we have purchased."[7]

### III.      DEFENDANTS' CONDUCT INCREASED THE PRICE OF ALUMINUM

#### a.  Pricing of Aluminum

77.     Purchasers of plain aluminum in the United States generally pay a price reflecting the total of two standardized pricing components: the Midwest Aluminum Premium (described below) and the LME price upon order placement.

---

[6] Richter, Joe and Agnieska Troszkiewicz.  "Beer Companies Press LME to Cut Aluminum Warehouse Backlogs."  Bloomberg News.  June 23, 2013.

[7] "Hearing on Examining Financial Holding Companies: Should Banks Control Power Plants, Warehouses and Oil Refineries? Senate Committee on Banking Financial Institutions and Consumer Protections.  Statement of Tim Weiner.  Global Risk Manager, Commodities/Metals, MillerCoors LLC.  July 23, 2013."
http://www.banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=9b58c6 70-f002-42a9-b673-54e4e05e876e

78.     Defendants' scheme (1) artificially decreased the supply of aluminum, thereby artificially driving up aluminum prices, and (2) raised the Midwest Aluminum Premium.

79.     The Midwest Aluminum Premium reflects, among other things, the costs of financing, storage, and freight for delivering aluminum from LME-approved warehouses to the Midwestern United States.

80.     Because storage costs are a key element of the Midwest Aluminum Premium, Defendants' scheme to delay delivery of aluminum artificially inflated that premium. The longer that aluminum is stored in Defendants' LME-approved warehouses, the higher the cost of storage.

81.     In January 2010 – before the Class Period – the Midwest Aluminum Premium was approximately 5.5 cents per pound. By January 2013, the Midwest Aluminum Premium had more than doubled in price to approximately 11.5 cents per pound.[8]

82.     Under typical circumstances, an increasing supply of aluminum stored in LME-approved warehouses would exert downward pressure on the price of the Midwest Aluminum Premium.

## IV.  DEFENDANTS' CONDUCT GAVE RISE TO MULTIPLE COMPLAINTS AND GOVERNMENT INVESTIGATIONS

83.     Defendants' activities have been the subject of many private complaints and government investigations.

84.     In June 2011, Coca-Cola filed a complaint with the LME accusing Goldman Sachs of creating supply bottlenecks to artificially raise the price of aluminum in the open market.

---

[8] Southwood, Mike. "US Midwest Premiums – The Method Behind the Madness." CRU. February 21, 2013. http://www.crugroup.com/about-cru/cruinsight/US_midwest_premiums

85.     In November 2012, the European Union's Enterprise and Industry Directorate General began a review of LME warehousing arrangements following complaints about accessing aluminum from LME warehouses and abnormally high premiums.

86.     In August 2013, Reuters reported that the U.S. Commodity Futures Trading Commission had subpoenaed Glencore, JPMorgan, and Goldman Sachs, demanding information about their warehousing practices.

87.     The Department of Justice reportedly began a preliminary probe into the aluminum warehousing industry in July 2013.

88.     Britain's Financial Conduct Authority is reportedly also considering a probe of defendants' warehousing practices.

## V.     DEFENDANTS SIGNIFICANTLY CHANGED THEIR PRACTICES IN THE WAKE OF NEWS REPORTS ABOUT THEIR ACTIVITIES

89.     Following a *New York Times* investigatory piece describing Defendants' activities, including the practice of shuttling aluminum between warehouses, JPMorgan announced plans to leave the physical commodities business entirely and Goldman Sachs significantly changed its practices.

90.     In July 2013, JPMorgan divested its physical commodities operations.

91.     In July 2013, Goldman Sachs indicated it was "contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."  It further announced that it:

    a.  "[S]upports the recently proposed rule change by the LME that is intended to cut existing queues by increasing substantially the amount of daily net outflows of metal at large LME locations";

b. "[S]uggest that the LME establish a system to prioritize end users so that they always have access to a minimum load out rate."; and

c. "[S]upport[s] enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue."

## RELEVANT MARKET

92. As the Defendants engaged in a horizontal restraint of trade that directly restricted the supply and inflated the price of aluminum, the Defendants committed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and its state analogs.  Accordingly, Plaintiffs are not required to allege a relevant market.

93. Notwithstanding the prior paragraph, to the extent Plaintiffs would be required to allege the existence of one or more relevant markets, Plaintiffs allege the relevant market is the market for storing aluminum in the United States in LME-approved warehouses ("Relevant Market").

94. There are no close substitutes for storing aluminum in the United States in LME-approved warehouses and no other products or services significantly constrain its pricing.

95. The relevant geographic market is the continental United States.

## ANTICOMPETITIVE EFFECTS & INJURY

96. Defendants' acts and practices, as alleged in this complaint, have had a substantial anticompetitive effect on interstate commerce in the United States through the restricted availability of aluminum in the United States and inflated payments to Defendants for both the storage of aluminum and for the commodity itself, operating to the detriment of Plaintiffs and the Classes.

97.     The acts and practices of Defendants, as alleged in this complaint, have had the purpose, tendency, and effect of unlawfully raising the price of aluminum and Aluminum Products throughout the United States.

98.     No legitimate pro-competitive efficiencies justify Defendants' conduct or outweigh their substantial anticompetitive effects.

99.     Absent Defendants' acts and practices, the price of aluminum and Aluminum Products would have been lower during the Class Period.

100.    Because of Defendants' acts and practices, Plaintiffs and the Classes have suffered injury to their business or property during the Class Period.  The injury sustained by Plaintiffs and the Classes is the payment of higher prices for aluminum and Aluminum Products.

101.    There is a direct, measurable, and traceable link between Defendants' acts and practices alleged in this complaint and the prices that Plaintiffs and the Classes paid for aluminum and Aluminum Products.  Defendants' acts and practices caused the prices of aluminum and Aluminum Products to be inflated.

102.    Producers and resellers of aluminum and Aluminum Products passed on the inflated charges to end-users of aluminum and Aluminum Products.

103.    The market for aluminum and the market for Aluminum Products are inextricably linked and intertwined because the market for aluminum exists to serve the Aluminum Products market.  Without Aluminum Products, aluminum has little to no value because it has no independent utility.  Indeed, the demand for Aluminum Products creates the demand for aluminum.

104.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of

competition a firm faces.  The markets for Aluminum Products are subject to vigorous price competition.  Producers have thin net margins, and are therefore at the mercy of their input costs, such that increases in the price of aluminum lead to corresponding increases in prices for Aluminum Products.  These overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and the members of the Classes.

105.    Hence, the inflated prices of aluminum in Aluminum Products has been passed on to Plaintiffs and the other members of the Classes.

106.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise the price of aluminum and, as a direct and foreseeable result, the price of Aluminum Products.

107.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.

108.    Regression analysis is one potential method by which to isolate and identify only the impact of an increase in the price of aluminum on prices for Aluminum Products even though such products contain a number of other inputs whose prices may be changing over time.  A regression model can explain how variation in the price of aluminum affects changes in the price of purchased or leased Aluminum Products.  In such models, the price of aluminum would be treated as an independent or explanatory variable.  The model can isolate how changes

in the price of aluminum impact the price of Aluminum Products controlling for the impact of other price-determining factors.

109.    The precise amount of the overcharge impacting the prices of Aluminum Products can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution.  Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

110.    By reason of the alleged violations of the antitrust laws and other laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Aluminum Products than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## FIRST CAUSE OF ACTION

**Declaratory and Injunctive Relief Under Section 16 of the Clayton Act, 15 U.S.C. § 26, and 18 U.S.C. § 2201(a) for Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 (on behalf of the Nationwide Class)**

111.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

112.    Beginning as early as 2010, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

113.   The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their unnamed co-conspirators.

114.   In particular, Defendants have combined and conspired to inflate prices of aluminum in the United States, which thereby inflated the price of Aluminum Products in the United States.

115.   The conduct of the Defendants is an unreasonable and unlawful restraint of trade, which is a *per se* violation of the federal antitrust laws.

116.   For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their unnamed co-conspirators did those things that they contracted, combined, or conspired to do, including but not limited to:

> a.   Treating the LME's minimum load-out rate as a maximum in order to earn illegitimate profits from increased storage revenue due to artificially inflated wait times; and
>
> b.   Agreeing to terms permitting and then transferring metal between LME-approved warehouses in order to receive increased storage revenue from aluminum not delivered to customers.

117.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have been injured in their business and property and paid more for Aluminum Products than they would have paid absent Defendants' illegal conduct.

118.   Defendants' actions, as alleged herein, constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Pursuant to the Declaratory Judgment Act, Plaintiffs and the Class seek judgment and decree that Defendants have violated Section 1 of the Sherman Act.

119.    Defendants' violations are continuing in nature and/or are threatened to recur. Accordingly, Plaintiffs, on behalf of themselves and the Nationwide Class, request that the Court enjoin and restrain Defendants' wrongful conduct pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## SECOND CAUSE OF ACTION

**Declaratory and Injunctive Relief Under Section 16 of the Clayton Act, 15 U.S.C. § 26, and 18 U.S.C. § 2201(a) for Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2 (on behalf of the Nationwide Class)**

120.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

121.    Beginning as early as 2010, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s).

122.    Defendants possessed sufficient market power to raise the price of aluminum, including the Midwest Transaction Premium, in the United States. During the Class Period, Defendants owned approximately 80% of U.S. LME-approved warehouses, and the LME also controlled approximately 97% of the aluminum futures and forward trading market in the United States and had the power to approve and regulate the warehouses that hold approximately 95% of the aluminum available for such trading.  Defendants were able to exact substantial and monopolistic price increases for both aluminum and the Midwest Transaction Premium, which demonstrates directly Defendants' market and monopoly power.

123.    Defendants have abused their monopoly power and have agreed with one another and other Defendants, to abuse their monopoly power. They have done so in order to anti-competitively and restrictively to limit unreasonably the free alienability of aluminum stored in

Detroit warehousing and, thereby, inflate aluminum prices as well as the storage costs paid directly to Defendants.

124.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have been injured in their business and property and paid more for Aluminum Products than they would have paid absent Defendants' illegal conduct.

125.    Defendants' actions, as alleged herein, constitute violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Pursuant to the Declaratory Judgment Act, Plaintiffs and the Class seek judgment and decree that Defendants have violated Section 1 of the Sherman Act.

126.    Defendants' violations are continuing in nature and/or are threatened to recur. Accordingly, Plaintiffs, on behalf of themselves and the Nationwide Class, request that the Court enjoin and restrain Defendants' wrongful conduct pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

### THIRD CAUSE OF ACTION

**Violation of the Cartwright Act,**
**Cal. Bus. & Prof. Code § 16720, *et seq.***
**(on behalf of the California Class)**

127.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

128.    Beginning as early as 2010, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants entered into and engaged in a continuing unlawful trust in restraint of trade and commerce in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*

129.    The continuing unlawful trust in restraint of trade and commerce or the Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their unnamed co-conspirators.

130.    In particular, Defendants have combined and conspired to inflate prices of aluminum in the United States, which inflated the price of Aluminum Products in the United States.

131.    The conduct of the Defendants is an unreasonable and unlawful restraint of trade which is a *per se* violation of the federal antitrust laws.

132.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things which they contracted, combined, or conspired to do, including:

> a.    Treating the LME's minimum load-out rate as a maximum in order to earn illegitimate profits from increased storage revenue due to artificially inflated wait times; and
>
> b.    Agreeing to terms permitting and then transferring metal between LME-approved warehouses in order to receive increased storage revenue from aluminum not delivered to customers.

133.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the California Class have been injured in their business and property and paid more for Aluminum Products than they would have paid absent Defendants' illegal conduct.

134.    Pursuant to Cal. Bus. & Prof. Code § 16750, Plaintiffs and the California Class seek treble damages, their cost of suit, including a reasonable attorneys' fee, and appropriate injunctive relief.

## FOURTH CAUSE OF ACTION

**Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq.*
(on behalf of the California Class)**

135.    Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

136.    Defendants' violations of the laws of the United States and California as alleged in this complaint constitute unlawful business practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*  Specifically, Defendants' conduct is unlawful because it violates the Sherman Act, Clayton Act, Cartwright Act, and 18 U.S.C. § 1964(c).

137.    Defendants' conduct as alleged in this complaint also constitutes an unfair business practice within the meaning of the Cal. Bus. & Prof. Code § 17200, *et seq.*  Defendants' conduct is substantially injurious to consumers and in violation of a legislatively-declared policy of California.  Consumers have paid, and continue to pay, supra-competitive prices for aluminum and Aluminum Products in California.   This injury to consumers is not outweighed by any countervailing benefits to consumers or competition.  Defendants have not articulated any legitimate reason for the conduct.  Further, consumers could not reasonably have avoided the injury from Defendants' and their unnamed co-conspirators' conduct.

138.    The conduct described herein also constitutes fraudulent or deceptive practices substantially affecting the conduct of trade or commerce in the State of California in violation of the Cal. Bus. & Prof. Code § 17200, *et seq.*  Defendants' conduct by artificially depressing the deliverable supply of aluminum was likely to deceive and mislead reasonable consumers with respect to the true supply and demand for and the supra-competitive pricing of aluminum and Aluminum Products.

139.   The conduct alleged herein is an "ongoing business practice" within the meaning of the Cal. Bus. & Prof. Code § 17200, *et seq.*  The unlawful, unfair, and deceptive business practices of Defendants, as described above, have injured, and present a continuing threat of injury, to Plaintiffs, the California Class, and members of the general public, in that Defendants' conduct has restrained and continues to restrain competition, and has caused and continues to cause payment of supra-competitive prices for Aluminum Products.

140.   As alleged in this complaint, Defendants have been unjustly enriched as a result of its wrongful conduct.  Plaintiffs, the California Class, and the general public are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such conduct, pursuant to the Cal. Bus. & Prof. Code §§ 17203 and 17204.

## FIFTH CAUSE OF ACTION

### Violations of Multi-State Antitrust and Restraint of Trade Laws
### (on behalf of the Multi-State Antitrust Class)

141.   Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

142.   Defendants have violated Arizona Revised Stat. Code §§ 44-1401, *et seq.*

143.   Defendants have violated District of Columbia Code Ann. §§ 28-4503, *et seq.*

144.   Defendants have violated Iowa Code §§ 553.1, *et seq.*

145.   Defendants have violated Kansas Stat. Ann. §§ 50-101, *et seq.*

146.   Defendants have violated 10 Maine Rev. Stat. §§ 1101, *et seq.*

147.   Defendants have violated Michigan Comp. Laws Ann. §§ 445.773, *et seq.*

148.   Defendants have violated Minnesota Stat. §§ 325D.52, *et seq.*

149.   Defendants have violated Mississippi Code Ann. §§ 75-21-1, *et seq.*

150.     Defendants have violated Nebraska Rev. Stat. §§ 58-801, *et seq*.

151.     Defendants have violated New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

152.     Defendants have violated New York Gen. Bus. Law §§ 340, *et seq*.

153.     Defendants have violated North Carolina Gen. Stat. §§ 75-1, *et seq*.

154.     Defendants have violated North Dakota Cent. Code §§ 51-08.1-.01, *et seq*.

155.     Defendants have violated South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

156.     Defendants have violated Tennessee Code Ann. §§ 47-25-101, *et seq*.

157.     Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq*.

158.     Defendants have violated West Virginia Code §§ 47-18-1, *et seq*.

159.     Defendants have violated Wisconsin Stat. §§ 133.01, *et seq*.

160.     As alleged in this complaint, as a direct and proximate result of Defendants' unlawful conduct, Class members in each of these states have been injured in their businesses and property in that they paid more for aluminum and Aluminum Products than they would have paid absent Defendants' unlawful conduct.

## SIXTH CAUSE OF ACTION

### Violations of Multi-State Consumer Protection and Unfair Competition Laws
### (on behalf of the Multi-State Consumer Protection Class)

161.     Plaintiffs re-allege and incorporate each and every allegation set forth in the paragraphs above.

162.     Defendants have violated Alaska Stat. §§ 45.50.471, *et seq*.

163.     Defendants have violated Arkansas Rev. Stat. §§ 4-88-101, *et seq*.

164.     Defendants have violated District of Columbia Code §§ 28-3901, *et seq*.

165.     Defendants have violated Florida Stat. §§ 501.201, *et seq*.

166.     Defendants have violated Georgia Code Ann. §§ 10-1-390, *et seq*.

167.    Defendants have violated Idaho Code §§ 48-601, *et seq*.

168.    Defendants have violated Kansas Stat. §§ 50-623, *et seq*.

169.    Defendants have violated Louisiana Rev. Stat. §§ 51:1401, *et seq*.

170.    Defendants have violated 5 Maine Rev. Stat. §§ 205-A, *et seq*.

171.    Defendants have violated Mass. Gen. Laws. Ch. 93A §§ 1, *et seq*.

172.    Defendants have violated Montana Code §§ 30-14-101, *et seq*.

173.    Defendants have violated Nebraska Rev. Stat. §§ 59-1601, *et seq*.

174.    Defendants have violated Nevada Rev. Stat. §§ 598.0903, *et seq*.

175.    Defendants have violated New Hampshire Rev. §§ 358-A:1, *et seq*.

176.    Defendants have violated New Mexico Stat. §§ 57-12-1, *et seq*.

177.    Defendants have violated New York Gen. Bus. Law §§ 349, *et seq*.

178.    Defendants have violated North Carolina Gen. Stat. §§ 75-1.1, *et seq*.

179.    Defendants have violated Rhode Island Gen. Laws §§ 6-13.1-1, *et seq*.

180.    Defendants have violated Utah Code §§ 13-11-1, *et seq*.

181.    Defendants have violated 9 Vermont Stat. §§ 2451, *et seq*.

182.    Defendants have violated West Virginia Code §§ 46A-6-101, *et seq*.

183.    As alleged in this complaint, as a direct and proximate result of Defendant's unlawful conduct, Class members in each of these states have been injured in their businesses and property in that they paid more for aluminum and Aluminum Products than they would have paid absent Defendants' unlawful conduct.

## **DEMAND FOR A TRIAL BY JURY**

184.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     That the court issue an order certifying the Classes defined in this complaint.

B.     That Defendants' conduct to raise the price of aluminum be adjudicated and decreed to have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, pursuant to 18 U.S.C. § 2201(a) and that an injunction be issued pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, permanently enjoining and restraining Defendants from maintaining or renewing the anticompetitive conduct, monopolization or attempted monopolization, or adopting or following any practice, plan, program, or device having a similar purpose of effect;

C.     That Plaintiffs and the Classes recover treble or other damages, or restitution as permitted by laws alleged in this complaint, and costs of suit, including reasonable attorneys' fees;

D.     That Plaintiffs and the Classes be awarded pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of this initial complaint in this action; and

E.     That Plaintiffs and the Classes have such further relief as the case may require and the Court may deem just and proper under the circumstances.

DATED: December 30, 2013          Respectfully submitted,

_Rosalee Thomas_

Rosalee B.C. Thomas
Douglas G. Thompson (*pro hac vice* to be filed)
Michael G. McLellan
Eugene J. Benick
FINKELSTEIN THOMPSON LLP
1077 30th Street, NW, Suite 150
Washington, DC 20007
Tel.: (202) 337-8000
Fax: (202) 337-8090

rbcthomas@finkelsteinthompson.com
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
ebenick@finkelsteinthompson.com